IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KIMBERLY WHITNEY,** | : | **Civil No.  4:24-CV-1950** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,**[1] | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM OPINION</u>**

## I.    <u>Introduction</u>

This case involves an unusual confluence of events which together in combination compel remand. The plaintiff, Kimberly Whitney, alleged she was unable to work due to an array of physical impairments and mental impairments including depression, borderline personality disorder, anxiety and post-traumatic stress disorder which she alleged would keep her off-task and absent in excess of allowable employment standards. (Tr. 44). Two State agency psychological consultants considered the medical record with regard to Whitney's mental

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

impairments and concluded she would be limited to jobs requiring only one- to two-step tasks. While Whitney underwent a consultative examination of her physical abilities, no treating or examining source opined on her mental capacity to perform work-related activity.

The longitudinal medical evidence of Whitney's mental impairments was not extensive but at least demonstrated that she had a history of abuse and neglect, two past psychiatric hospitalizations, a history of self-harm, and was receiving psychiatric treatment during the relevant period. The ALJ accepted that Whitney's mental impairments would at least moderately affect her ability to perform work-related activity and partially credited the opinions of the State agency experts. However, the ALJ rejected the expert consensus that Whitney would be limited to one- to two-step tasks, an aspect of these medical opinions which would have rendered her unable to perform the jobs the ALJ concluded she could perform. Thus, the ALJ substituted his own lay opinion of the evidence in concluding that Whitney would not be limited to one- to two-step tasks, a conclusion which was clearly outcome determinative and unmoored to any medical opinion; and denied this claim. On this striking confluence of events, we are reminded of two basic tenets of Social Security practice. First, it is well settled that the ALJ may not simply substitute "her

2

own credibility judgments, speculation or lay opinion," for the opinions of medical

sources. Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). Moreover:

> ALJs have a duty to develop a full and fair record in social security cases. See Brown v. Shalala, 44 F.3d 931, 934 (11th Cir.1995); Smith v. Harris, 644 F.2d 985, 989 (3d Cir.1981). Accordingly, an ALJ must secure relevant information regarding a claimant's entitlement to social security benefits.

Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995).

In the instant case, the ALJ's decision to ignore an outcome determinative

medical opinion consensus and failure to seek an examining source to support the

decision that Whitney's mental impairments were not disabling, was error.

Therefore, this case will be remanded for further consideration by the

Commissioner.

## II.      Statement of Facts and of the Case

On January 3, 2022, Kimberly Whitney filed applications for disability and

supplemental security income benefits under Titles II and XVI of the Social Security

Act, alleging disability beginning March 4, 2021. (Tr. 17). In this application,

Whitney alleged that she was disabled due to an array of physical and mental

impairments, including borderline personality disorder, chronic fatigue, major

depressive disorder with psychosis, post-traumatic stress disorder (PTSD), mixed

anxiety depressive disorder, polycystic kidney disease, irritable bowel syndrome,

3

and restless leg syndrome. (Tr. 63). Whitney was born on January 18, 1985, and was 36 years old, which is defined as a younger individual under the Commissioner's regulations, on the alleged disability onset date. (Id.)

With respect to her mental impairments, Whitney submitted an Adult Function Report which identified a constellation of impairments including that she has panic attacks and is paranoid constantly, gets anxiety and is unable to regulate her emotions, needs reminders for appointments and forgets to eat, can only pay attention for five to ten minutes and cannot handle stress or changes in routine. (Tr. 337-43). These subjective reports were corroborated by treatment notes from her initial psychiatric evaluation at Pennsylvania Counseling Services in June 2022, which noted significant psychological symptomology including poor energy and motivation, trouble sleeping, lack of appetite, passive suicidal thoughts, daily anxiety, twice weekly panic attacks, waking at night yelling out, mood reactivity due to past trauma, chronic feelings of emptiness, self-destructive behaviors, emotional lability, poor frustration tolerance, a pattern of difficulty with interpersonal relationships, and a history of self-harm. (Tr. 503-04). She also reported a history of visual hallucinations of "dead people" previously when she was severely depressed. (Tr. 504). A past history of psychiatric hospitalization was also reported including one hospitalization in 2019. (Tr. 504).

Whitney was diagnosed with recurrent moderate major depressive disorder (MDD), post-traumatic stress disorder (PTSD) from physical, sexual, and emotional abuse, borderline personality disorder. (Tr. 504-05). Thus, Whitney's psychological impairments and the symptoms she described were reinforced in the objective medical record. Nonetheless, as often occurs, her mental status examinations were largely normal in some other spheres, showing normal concentration and thought content, good insight and judgment, intact memory, and appropriate manner. (Tr. 505, 636, 640, 644, 647, 652, 655). She attended psychiatric care between December 2021 and May 2024 at Pennsylvania Counseling Services where she continued to report symptoms of her psychological impairments. (Tr. 483-602, 634-712, 886-1052). However, medication supervision reports in March 2023 and January 2024 indicated her conditions were stable and improving on medication. (Tr. 634-35, 898-99). Thus, the longitudinal record of her mental impairments demonstrates these impairments were severe and supports her subjective reports of symptoms, yet indicates that her conditions were variable, like many psychological impairments, and periodically improved with treatment.

Given this equivocal clinical history, two non-treating, non-examining sources opined on the limiting effects of Whitney's mental impairments. In November 2022, State agency psychological consultant Dr. Marci Cloutier reviewed

5

Whitney's medical record and opined that she would have mild limitations in her ability to understand, remember, or apply information and moderate limitations in her ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. (Tr. 65). Specifically, Dr. Cloutier opined that Whitney would be moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from her symptoms, and respond appropriately to changes in the work setting. (Tr. 69-70). In explaining her RFC limitations, Dr. Cloutier included a familiar limitation to one-to-two step tasks, stating:

> Based on available evidence, clm able to concentrate, persist and maintain pace to complete tasks. Clm is able to understand and apply basic information. Clm is able to appropriately interact with others and cope with mild stressors. Intensity and persistence of reported sx's have a moderate limiting effect on functioning and is partially consistent with mer. Clm's impairment would not preclude 1-2 step functions on a sustained basis.

(Tr. 70).

The opinion of Dr. Cloutier was largely mirrored on reconsideration in May 2023 by State agency psychological consultant Dr. Faisal Roberts. Dr. Roberts opined that Whitney had the same limitations in the "paragraph B" criteria and the same moderate limitations in her capacity to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and

6

workweek without interruptions from her symptoms, and respond appropriately to changes in the work setting. (Tr. 88-93). In concluding that Whitney could understand, retain, and follow only simple instructions, Dr. Roberts specifically clarified that this meant she could perform only one- and two-step tasks, stating:

> The claimant's basic memory processes are intact. The claimant can understand, retain, and follow simple instructions (i.e., perform one- and two-step tasks). The claimant can make simple decisions and would not require special supervision in order to sustain a routine. The claimant can perform simple, routine, repetitive tasks in a stable environment. The claimant is capable of performing within a schedule and at a consistent pace.

(Tr. 93). Indeed, Dr. Roberts took particular care to clarify that his opinion that Whitney would be limited to simple instructions meant that she could only perform one- and two-step tasks.

The state agency psychological consultants Dr. Cloutier and Dr. Roberts were the only experts to opine on Whitney's mental RFC. Thus, the record was devoid of any opinion by an expert who had treated or examined Whitney to determine the limiting effects of her mental impairments. Nonetheless, the consensus of the two State agency experts was that Whitney would, at most, be able to perform one- to two-step tasks.

It was against this medical backdrop that Whitney's disability claim came to be heard by the ALJ on August 13, 2024. (Tr. 39-62). At the hearing, Whitney

7

testified that she was unable to sustain full-time work due to the combined effects of her physical and mental impairments that would keep her off task and absent in excess of allowable employment standards. (Tr. 44). She described paranoia and difficulty interacting with others. (Tr. 56-57). A vocational expert (VE) testified that an individual with a residual functional capacity (RFC) identified by the administrative law judge (ALJ) could perform the occupations of marker, router, and routing clerk, all with a reasoning level of two. (Tr. 59-60). The ALJ did not question the VE about the effect of limiting Whitney to one- to two-step tasks, despite both medical experts who opined on Whitney's mental abilities concluding that this was the most she could perform.

Following this hearing, on August 23, 2024, the ALJ issued a decision denying Whitney's application for benefits. (Tr. 14-33). In that decision, the ALJ first concluded that the plaintiff met the insured status requirements of the Social Security Act through December 31, 2026, and had not engaged in substantial gainful activity since March 4, 2021, the alleged onset date. (Tr. 19-20). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Whitney had the following severe impairments: obesity, polycystic kidney disease, restless leg syndrome, depression disorder, borderline personality disorder, anxiety disorder, and post-traumatic stress disorder (PTSD). (Tr. 20).

8

At Step 3, the ALJ determined that these impairments did not meet or medically equal the severity of any listed impairments. (Tr. 21-23).  In considering whether her mental impairments met the criteria of a listing, the ALJ concluded she had mild limitations in understanding, remembering, or applying information, and moderate limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. (Id.)

Between Steps 3 and 4, the ALJ then fashioned the following residual functional capacity (RFC) assessment for Whitney:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no climbing ladders, ropes, or scaffolds, as those are defined in the DOT/SCO. The claimant can do occasional crawling, balancing, crouching, kneeling, stooping, or climbing ramps or stairs, as those are defined in the DOT/SCO; and have occasional exposure to non-weather temperature extremes of heat or cold, wetness and non-weather humidity, vibration, or atmospheric conditions, as those are defined in the DOT/SCO. The claimant can have no exposure to hazards, as those are defined in the DOT/SCO. She can have frequent interactions with supervisors, coworkers, and/or the public; can carry out simple instructions; cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas; and can deal with occasional changes in a routine work setting.

(Tr. 23).

In reaching this RFC determination, the ALJ clearly accounted for some of the limitations opined by the only two medical experts who opined on Whitney's

9

abilities but overtly rejected the medical consensus that she would be limited to one- to two-step tasks, the only limitation opined by these experts that would have rendered the plaintiff unable to perform the occupations identified by the vocational expert.

On this score, the ALJ found the opinions of Dr. Cloutier and Dr. Roberts "generally persuasive," concluding that these opinions were supported by citation to objective medical evidence and a narrative explanation and were mostly consistent with the objective findings, treatment history, and activities of daily living. (Tr. 28). However, as to the one- to two-step limitation opined by both experts, the only limitation which would have rendered Whitney unable to perform the jobs identified by the VE, the ALJ explained:

> [T]he limitation to one to two-step mentation is not persuasive as this is contrary to the claimant's own stated capacity and findings on objective examination. For example, the longitudinal record shows well preserved mentation despite varied diagnosis and with only medication and therapy (Exhibit 1F/6; 2F/47; 3F/2-3, 6-7, 10-11, 14-15, 18-19, 23-24, 27, 32, 34, 36, 38, 40, 42, 44, 46, 48, 50). The record also longitudinally consistently notes the claimant has a very good response to therapy and is making good progress (Exhibit 3F; 8F; 13F). Moreover, the claimant is independent with activities of daily living including driving, taking her children to school events, completing household chores, and managing her son's benefits (Testimony; Exhibit 6E; 11E).

(Tr. 28). Thus, based upon the ALJ's own interpretation of the record, he concluded that a one- to two-step task limitation was inconsistent with the objective findings,

10

treatment history, and activities of daily living, but the balance of the opinions of these experts were entirely consistent with these records.

Having made these findings, the ALJ concluded that Whitney could perform the jobs of marker (DOT 209.587-034; 165,089 jobs nationally); router (DOT 222.587-038; 22,160 jobs nationally); and routing clerk (DOT 222.687-022; 105,700 jobs nationally). (Tr. 32). Accordingly, the ALJ concluded that the plaintiff did not meet the stringent standard for disability set by the Act and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Whitney argues, *inter alia*, that the ALJ erred in rejecting the expert consensus that she would be limited to one- to two-step tasks and for failing to order consultative examination to support his RFC determination. After a review of the evidence, we agree that the ALJ's failure to acknowledge the medical consensus or further develop the record and instead adopt an RFC which was bereft of medical opinion support resulted in an erroneous disability determination. Therefore, we will remand this case for further consideration by the Commissioner.

## III.    **Discussion**

### A. **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the

11

findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

12

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

13

matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

14

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based in part upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ

15

offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous

16

work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe

17

impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

18

physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

19

it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

20

explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C. **The ALJ's Duty to Develop the Medical Record.**

There is a necessary corollary to these legal standards defining the role of the ALJ in disability determinations. As the Supreme Court has observed:

> Although "[m]any agency systems of adjudication are based to a significant extent on the judicial model of decisionmaking," 2 K. Davis & R. Pierce, Administrative Law Treatise § 9.10, p. 103 (3d ed.1994), the SSA is "[p]erhaps the best example of an agency" that is not, B. Schwartz, Administrative Law 469–470 (4th ed.1994). See id., at 470 ("The most important of [the SSA's modifications of the judicial model] is the replacement of normal adversary procedure by ... the 'investigatory model' " (quoting Friendly, Some Kind of Hearing, 123 U. Pa. L.Rev. 1267, 1290 (1975))). Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits, see Richardson v. Perales, 402 U.S. 389, 400–401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) . . . .

Sims v. Apfel, 530 U.S. 103, 110–11, 120 S. Ct. 2080, 2085, 147 L. Ed. 2d 80 (2000).

Consequently, it is a fundamental  basic tenet of Social Security practice that:

> ALJs have a duty to develop a full and fair record in social security cases. See Brown v. Shalala, 44 F.3d 931, 934 (11th Cir.1995); Smith

21

v. Harris, 644 F.2d 985, 989 (3d Cir.1981). Accordingly, an ALJ must secure relevant information regarding a claimant's entitlement to social security benefits.

Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995).

Therefore, an ALJ has a responsibility to assist a claimant in fully and fairly developing the factual record relating to a disability claim. See Sanchez v. Comm'r of Soc. Sec., 271 Fed.Appx. 230, 233 (3d Cir. 2008). As part of this duty, "[t]he decision to order a consultative examination is within the sound discretion of the ALJ." Basil v. Colvin, No. CIV.A. 12-315E, 2014 WL 896629, at *2 (W.D. Pa. Mar. 6, 2014) citing Thompson v. Halter, 45 Fed.Appx. 146, 149 (3d Cir. 2002); 20 C.F.R. §§ 404.1517, 416.917. However, the exercise of this discretion is guided by settled principles and is linked to an informed assessment of the evidence in each case. Thus:

> An "ALJ's duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision." Id. Other circumstances necessitating a consultative examination include situations where a claimant's medical records do not contain needed additional evidence, or when the ALJ needs to resolve a conflict, inconsistency or ambiguity in the record. See, 20 C.F.R. §§ 404.1519(a), 416.919(a).

Basil v. Colvin, No. CIV.A. 12-315E, 2014 WL 896629, at *2 (W.D. Pa. Mar. 6, 2014). See Rissmiller v. Colvin, No. CV 15-5731, 2016 WL 6107209, at *5 (E.D. Pa. Oct. 18, 2016). Therefore, a determination of whether a consultative examination

22

is needed in a particular case is a discretionary judgment by an ALJ and is a judgment that should be firmly rooted in an assessment of the evidence as a whole. Ultimately, the ALJ's duty to develop the record requires a consultative examination when it is shown that the claimant has established that such an examination is needed to enable the ALJ to make a fully informed disability decision. See Thompson v. Halter, 45 Fed.Appx. 146, 149 (3d Cir. 2002); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5–6 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017).

It is against these legal guideposts that we assess the ALJ's decision in this case.

### D. **This Case Will Be Remanded.**

After a review of the record, we conclude that the ALJ's analysis in this case was flawed in at least two material ways. At the outset, the ALJ rejected a medical consensus that Whitney would be limited to jobs requiring only one- to two-step tasks and instead fashioned an RFC based largely upon his own lay interpretation of the evidence. On this score, no treating or examining source opined on Whitney's mental RFC. Instead, the ALJ relied, in part, upon the opinions of two non-treating, non-examining State consultative examiners in formulating the mental RFC. The

23

ALJ found these opinions generally persuasive but rejected their consensus that Whitney would be limited to jobs requiring only one- to two-step tasks. Instead, the ALJ fashioned a mental RFC which was divorced from the medical consensus, and was based upon the ALJ's lay opinion that, "the longitudinal record shows well preserved mentation," and notes that she responded well to therapy. (Tr. 28).

In our view, this is simply not a sufficient explanation, grounded in the evidence, for rejecting a medical consensus regarding a potentially disabling limitation where the ALJ credited these expert's opinions that she would be moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods. Moreover, it is unclear what the ALJ meant by the record showing "well preserved mentation," where the record, in fact, noted two psychiatric hospitalizations, including one in 2019, and significant psychological symptomology including poor energy and motivation, trouble sleeping, lack of appetite passive suicidal thoughts, daily anxiety, twice weekly panic attacks, waking at night yelling out, mood reactivity due to past trauma, chronic feelings of emptiness, self-destructive behaviors, emotional lability, poor frustration tolerance, a pattern of difficulty with interpersonal relationships, and a history of self-harm. (Tr. 503-04). Given this backdrop acknowledged by the ALJ, more was needed by way of explanation to reject this medical source consensus.

24

Indeed, the ALJ's decision to reject *every* medical opinion in this case in favor of his own view of the evidence is particularly problematic since:

> In following this course and effectively discounting *all* medical opinions, the ALJ gave insufficient credence to the concept that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11-2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)).

Diaz v. Berryhill, 388 F. Supp. 3d 382, 398 (M.D. Pa. 2019). Moreover, it is axiomatic that an ALJ errs in relying upon his own lay opinion to reject clinically supported medical source opinions. See Cordero v. Kijakazi, 597 F. Supp. 3d 776, 806 (E.D. Pa. 2022). Thus, it is well settled that the ALJ may not simply substitute "her own credibility judgments, speculation or lay opinion," for the opinions of medical sources. Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).

The rejection of only this aspect of these medical source opinions is undeniably outcome determinative, since, although the ALJ did not include this limitation in a hypothetical to the VE at the hearing,[2] a rising tide of caselaw has

---

[2] The ALJ's failure to include a one- to two-step limitation in the hypotheticals posed to the VE at the hearing is also problematic. Indeed, the Third Circuit has repeatedly recognized that "hypothetical question posed to a vocational expert 'must reflect *all* of a claimant's impairments," and requires "great specificity . . . when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical." Ramirez v. Barnhart, 372 F.3d 546, 554–55 (3d Cir. 2004) (quoting Charupcala v.

25

concluded that this type of one- to two-step limitation is inconsistent with reasoning

level 2 work; a reasoning level required by all of the occupations identified by the

vocational expert. See Daniel M. v. Kijakazi, No. 2:21-CV-243, 2023 WL 154909,

at *3 (D. Vt. Jan. 11, 2023) (collecting cases). Moreover, in our view, the ALJ's

decision has the appearance of a  results oriented outcome since the ALJ seemingly

rejected the only part of these concurring opinions which would render the plaintiff

unable to perform the occupations identified by the VE.[3]

---

Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Burns v. Barnhart, 312 F.3d 113, 122 (3d. Cir. 2002).

[3] The plaintiff also argues on appeal that the jobs identified by the VE, which were pulled from the Dictionary of Occupation Titles (DOT) are outdated and are both performed differently and not as abundantly available as when the DOT was last updated in the 1970s. Without precedent to support a decision to entirely abandon the DOT as the primary source used in Social Security disability cases to determine whether a claimant is disabled or can perform work that exists in the national economy, it is worth noting that Courts have recently expressed concern over the relevancy of the DOT, which the Department of Labor discontinued updating in 1991 and, seemingly, replaced with O*NET. See Junod v. Berryhill, No. CV 17-1498, 2018 WL 5792214, at *4 (W.D. Pa. Nov. 5, 2018) (citing Whitmire v. Commissioner of Society Security, Civ. No., 2014 WL 582781, *9 (M.D. Pa. Feb. 14, 2014); Cunningham v. Astrue, 360 Fed. Appx. 606, 615-16 (6th Cir. 2010)). Nonetheless, overall, courts in our circuit and others have been hesitant to reject the testimony of Vocational Experts relying upon the DOT in favor of the descriptions on O*NET, given the fact that "Social Security Ruling 00-4P sets forth that the relevant inquiry is whether VE testimony is consistent with the DOT." Devault v. Astrue, Civ. No. 2:13-cv-0155, 2014WL 3565972, at *6 (W.D. Pa. July 18, 2014). See Smith v. Comm'r of Soc. Sec., No. CV 19-20682 (RBK), 2020 WL 7396355, at *7 (D.N.J. Dec. 17, 2020) (the ALJ fulfilled her obligation by inquiring whether there was any conflict between the vocational expert's testimony and the DOT.

This cascade of errors on the part of the ALJ was then compounded by the failure to seek a mental consultative examination. Here, the ALJ found the opinions of the non-examining, non-treating sources generally persuasive, except to the extent that their consensus would render the plaintiff unable to perform the occupations identified by the VE. But the ALJ erred in basing this conclusion upon his lay interpretation of the longitudinal record regarding her "intact mentation." Given the significance of this issue to the disability determination we believe that the ALJ was required to order a consultative examination if the ALJ believed the consensus of the State agency experts was not supported by the evidence.

On this score, it is clear that "a determination of whether a consultative examination is needed in a particular is a discretionary judgment by an ALJ, and is a judgment that should be firmly rooted in an assessment of the evidence as a whole."

---

Moreover, the inconsistency that Plaintiff points to is not an inconsistency *with the DOT*. . . . The VE is allowed to rely on the DOT even if it is inconsistent with its more modern counterpart O*NET); Junod v. Berryhill, No. CV 17-1498, 2018 WL 5792214, at *4 (W.D. Pa. Nov. 5, 2018) (collecting cases). This Court has acknowledged criticisms regarding the reliability of the "aging DOT" but declined invitations to "abandon the VE's testimony regarding the DOT job descriptions in favor of those found in O'Net . . . in large part, due to the lack of clarity as to whether the Commissioner consider O'Net a reliable resource." Whitmire, 2014 WL 582781, at *10. Thus, we will follow the course we have in the past and decline to remand on this issue, while acknowledging the plaintiff's desire to preserve this issue should there be a sea change in the law on this score. See Pollock v. O'Malley, No. 1:22-CV-1856, 2024 WL 4803530 (M.D. Pa. Nov. 15, 2024).

Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *6 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017). However, in the exercise of this discretion, "circumstances necessitating a consultative examination include situations where a claimant's medical records do not contain needed additional evidence, or when the ALJ needs to resolve a conflict, inconsistency or ambiguity in the record." Basil v. Colvin, No. CIV.A. 12-315E, 2014 WL 896629, at *2 (W.D. Pa. Mar. 6, 2014). Here, to the extent the ALJ concluded the opinions of the only experts who opined on Whitney's mental RFC conflicted with the record as to her ability to perform one- to two-step tasks, the ALJ should have sought another opinion to supplement the record and support the RFC determination.

Simply put, the ALJ erred by rejecting the state agency expert consensus that Whitney would be limited to one- to two-step tasks without further developing the record by seeking an examining source to opine on her mental RFC and fashioning an RFC for Whitney which was untethered to any medical opinion. This cascade of errors committed by the ALJ resulted in an RFC assessment which is unsupported by substantial evidence. Yet, while we conclude that these errors compel a remand in this case, nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence

should be. Instead, that judgment should remain to province of the ALJ once an adequate medical record is fully developed.

## IV.    <u>Conclusion</u>

Accordingly, for the foregoing reasons, the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: February 25, 2026